# DUPONT v. DISTRICT OF COLUMBIA.

POLICE REGULATIONS; COLLECTION AND DISTRIBUTION OF GARBAGE.

1. A police regulation requiring wagons used for the transportation of garbage through the city to have the word "garbage" and the number of the wagon in large white letters on a black ground, plainly painted or attached to each side of the wagon bed, and providing for a particular construction and equipment of such wagon is a reasonable police regulation.

2. The regulations promulgated by the Commissioners of this District for the collection and disposition of garbage under the act of Congress of June 6, 1900, which regulations provide, as required by that act, for a disposition of all garbage by a reduction and consumption process, and in addition prohibit the removal and disposition of garbage by any one other than the garbage contractor, and also prohibit the transportation of garbage beyond the District for the purpose of feeding the same to animals, are a valid exercise of the police power; and one who hauls through the streets garbage which he has purchased from a hotel proprietor under a yearly contract of purchase of all garbage accumulating at the hotel, intending to take it beyond the district to feed it to hogs and to use it in part as a fertilizer for his land, is properly convicted in the police court of a violation of such regulation; *distinguishing* Campbell v. District of Columbia, 19 App. D. C. 131.

3. It must be presumed that Congress before legislating upon the subject of the collection and disposition of garbage in this District by the act of June 6, 1900, was fully informed as to the probable danger to health from the careless deposit and disposition of garbage; *following* Moses v. United States, 16 App. D. C. 428.

4. While the fact that a person is willing to buy garbage and use it for the purpose of feeding his animals and of using it as a fertilizer, is evidence that garbage is not a nuisance, it is not of itself sufficient to remove it from the category of nuisances and settle its character as property.

5. Each case involving the validity of the exercise of the police power must depend upon its own circumstances and conditions, and it is only when these clearly show that the regulation or restriction

imposed has no substantial relation to objects within the police power and, therefore, constitute a palpable invasion of private right, that the *courts are justified in denying their obligation; following* Campbell v. District of Columbia, 19 App. D. C. 131.

6. All matter which may be laid aside merely in the preparation of dishes for the table is not necessarily garbage, and, therefore, subject to the same regulation in all respects; but when such matter is mingled with garbage it becomes likewise subject to public control, notwithstanding that in some instances the owners might be able to dispose of it for a price to persons willing to make use of it in its unreduced state as either animal food or fertilizer.

No. 1234. Submitted October 16, 1902. Decided November 4, 1902.

IN ERROR to the police court of the District of Columbia. *Judgment affirmed.*

The COURT in the opinion stated the case as follows:

Plaintiff in error, Gerald Dupont, was convicted in the police court upon an information charging the violation of the regulations relating to the removal and disposition of garbage.

The District appropriation act of Congress of June 6, 1900, after appropriating a large sum of money for the collection and disposition of garbage, refuse, ashes and so forth, contained certain provisions prescribing the duties of the Commissioners in respect to the subject of the expenditure. (1) They were authorized to enter into a contract for the collection and disposition of garbage, miscellaneous refuse, ashes, night soil and dead animals, under such regulations and specifications as they may establish, for a period not exceeding five years. (2) They were directed to fix collection districts, and provide for collections therein respectively, daily, tri-weekly and semi-weekly as might be required. (3) All garbage shall be disposed of through a reduction or consumption process, so as to entail no damage or claim against the District, and subject to the sanitary inspection and approval of the Commissioners. (4) All contracts shall expressly provide that no garbage, or other vegetable or ani-

mal matter shall be dumped into the Potomac river, or any other waters, *or fed to animals or exposed to the elements upon lands.*  (5) Authorizing temporary contracts pending the erection of the necessary plant for collection and reduction or consumption.  (6) Authorizing the making of all regulations necessary for the collection and disposal of the specified refuse, and the enactment of such penalties as may in the judgment of the Commissioners be necessary to secure their enforcement.

On October 11, 1900, the Commissioners entered into a contract for the execution of the law with the Washington Fertilizer Company for five years from December 1, 1900, without charge to householders for the service.  The contractor established the necessary plant for the disposition of the collected garbage, the location and construction of which were approved by the Commissioners.

Elaborate regulations were adopted and promulgated by the Commissioners, the parts of which relevant to the issues in this case are as follows:

" Section 1. The word ' garbage,' wherever it occurs in these regulations, shall be held to mean the refuse of animal and vegetable foodstuffs; and the words ' dead animal,' wherever they occur in these regulations, shall be held to mean any dead animal not killed for food.  Section 2.  Occupants of dwelling-houses, proprietors of boarding-houses, commission warehouses, hotels, restaurants and other places where garbage is accumulated, and owners or occupants of apartment or tenement houses, shall provide for the use of such premises a sufficient number of receptacles to contain all garbage which may accumulate on said premises during the usual interval between the collections of garbage therefrom, and shall keep such receptacles at all times in good repair.  Each such receptacle shall be made of metal, water-tight, provided with a tight cover with a handle, and shall be so constructed that the contents can be removed therefrom easily and without delay. No person, without a permit from the superintendent of street cleaning, shall use for the reception of garbage any receptacle having a capacity of less than three nor more than

ten gallons, nor more than one receptacle containing less than
ten gallons.    Section 3. Occupants of any dwelling-house,
apartment or tenement house, and each proprietor of any
boarding-house, commission warehouse, hotel, restaurant, and
other place where garbage is accumulated, shall cause all
garbage from his or her premises to be put into the receptacle
provided for that purpose.    Each person aforesaid shall cause
such receptacle to be kept covered at all times, and to be
placed and to remain, between the hours of 7 o'clock, A. M.,
and 6 o'clock, P. M., of each day on which the collection is
made from his or her premises, in such position as to be
easily accessible to the garbage collector, or as may be desig-
nated by the superintendent of street cleaning.    No person
shall place or cause to be placed in any garbage receptacle
any substance other than garbage.    *    *    *

" Section 8. It shall be unlawful for any person to deposit,
throw or place any garbage, dead animal, fish or refuse, ani-
mal or vegetable matter in any avenue, alley, street, or other
public place in the District of Columbia, or into the Potomac
river or any other waters in the said District; nor shall any
person place such materials upon any private property,
whether owned by such person or not, unless the same shall
be inclosed in proper vessels, as provided in section 2; nor
shall any person feed any such materials in the District of
Columbia to any cows or other animals used for food, or
transport, or cause or permit such materials to be trans-
ported beyond the said District for the purpose of feeding
the same to animals.    Section 9. It is hereby made the duty
of the contractor with the District of Columbia for the col-
lection and removal of garbage and dead animals to collect
and remove, in accordance with the regulations and contract
of the said District, all garbage, dead animals, fish and refuse
animals and vegetable matter found within the District, to
some place to be designated or approved by the Commis-
sioners of the District, and to dispose of the same through
a reduction or consumption process, subject to the sanitary
inspection and approval of said Commissioners; and each

cart or other vehicle used for the purpose of removing garbage shall have the word 'garbage,' and the number of the wagon in large white letters on a black ground, plainly painted or attached to each side of the wagon bed, which shall be of metal, water-tight, and provided with tight-fitting covers, and be approved by the superintendent of street cleaning. All dead animals shall be removed to the place of disposal in covered wagons or other vehicles or conveyances as nearly air-tight as possible, to be approved by the superintendent of street cleaning. And it shall be unlawful for any person to use for the removal of garbage or dead animals any cart, wagon, vehicle or other conveyance not so approved. No other person or party except the District contractor, his, their, or its agents, shall carry, convey or transport through the streets, alleys, or public places of the said District, any garbage, dead animals, fish, or refuse animals or vegetable matter; and it shall be unlawful for any person to interfere in any manner with the collection and disposal of such materials or dead animals by the District contractor, his, their, or its agents or employees. *Provided,* that the owner of any dead animal, if the same shall have died upon private premises, may remove the same, or cause it to be removed within four hours after it shall have died, otherwise such removal shall be within one hour thereafter, to a place or places to be approved by the Commissioners of said District, whence it shall be taken and disposed of by the reduction process, subject to the sanitary inspection of the said Commissioners. All garbage, dead animals, night soil, miscellaneous refuse and ashes must be within the digesting tanks, or within the furnace, or otherwise in process of actual disposal, not later than 6 o'clock, A. M., on the day following their receipt by the contractor or other person for such disposal."

It is further provided that all garbage and other refuse shall be completely reduced, etc., within forty-eight hours.

The agreed statement of facts shows that the plaintiff in error, Gerald Dupont, had purchased of O. G. Staples, the proprietor of the Riggs and National Hotels, all garbage accumulating at said hotels for one year, beginning January

1, 1902, contracting to pay therefor the sum of $300. That on May 3, 1902, he collected several cans of said garbage from said hotels and was hauling the same through the streets of Washington, intending to take it to his farm in Maryland. That his intention was to feed it in part to hogs and to use it in part as a fertilizer for his land. That it was not intended to be disposed of by the reduction or consumption process as indicated in the police regulations of the Commissioners. That he had no permit for hauling the said garbage, but that the same was contained in water-tight metal cans of more than five gallons capacity, properly covered, and of the kind and character prescribed by the regulations to be kept by householders for the reception of garbage. That the garbage which he was removing when arrested was worth to him the sum of five dollars.

Based on the foregoing facts, the defendant on the trial requested several instructions to the jury, in substance, that the regulations were arbitrary and unreasonable, and deprived him of his property without just compensation or due process of law. These were refused, and the defendant was convicted and sentenced to pay a fine of thirty dollars.

*Mr. Sidney T. Thomas* and *Mr. Robinson White* for the plaintiff in error:

1. The effect of the garbage regulation under consideration is to deprive owners of garbage of their property without compensation. Cooley Const. Lim. (5th ed.), 248; *Rendering Co.* v. *Behr,* 77 Mo. 91; *Underwood* v. *Green,* 42 N. Y. 140; *Campbell* v. *District of Columbia,* 19 App. D. C. 131; *Kussel* v. *City of Erie,* 8 Pa. Dist. 105; *State* v. *Mott,* 61 Md. 297.

2. The police regulation in question has no substantial relation to the subject of public health. *Mugler* v. *Kansas,* 123 U. S. 623; *Lawton* v. *Steele,* 152 U. S. 133; *Moses* v. *United States,* 16 App. D. C. 428.

3. Municipal ordinances placing restrictions on the conduct of business or the use of property must, in order to be

valid, specify the rules and conditions to be observed in such conduct or business or the use of such property, and must not admit of the exercise of any arbitrary discrimination by the municipal authorities as between citizens who will comply. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Barthel* v. *City of New Orleans,* 24 Fed. Rep. 563.

4. The clause in the District appropriation bill authorizing the Commissioners to provide for the removal of garbage contemplates only such garbage as is abandoned by the owners. *In re Lowe,* 54 Kan. 757; *Weil* v. *Ricord,* 24 N. J. Eq. 169.

*Mr. Andrew B. Duvall,* Corporation Counsel, and *Mr. Edward H. Thomas,* Assistant, for the appellee:

The act of June 6, 1900, is valid as a proper exercise of the police power. *Moses* v. *United States,* 16 App. D. C. 428; *Campbell* v. *District of Columbia,* 19 App. D. C. 131; *Slaughter-House Cases,* 16 Wall. 36; *Deems* v. *The City of Baltimore,* 80 Md. 173; *Board of Police Commissioners* v. *Wagner* (Md.), 48 Atl. Rep. 455; *Mugler* v. *Kansas,* 123 U. S. 623; *Walker* v. *Jameson,* 144 Ind. 691; *Train* v. *Boston Disinfecting Co.,* 144 Mass. 524; Tiedman on Mun. Corp., par. 120; *Vandine, Petitioner,* 6 Pick. 187; *Lawton* v. *Steele,* 152 U. S. 133; *Smiley* v. *McDonald* (Neb.), 27 L. R. A. 540, and note; *Louisville* v. *Wible,* 84 Ky. 290; *State of Connecticut* v. *Orr,* 68 Conn. 101; 34 L. R. A. 279; *City of Grand Rapids* v. *De Vries,* 123 Mich. 570; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Chicago, Burlington, etc., RR. Co.* v. *Chicago,* 166 U. S. 255; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650; *Leisy* v. *Hardin,* 135 U. S. 128; *Ouray* v. *Carson,* 59 Pac. Rep.; *Alpers* v. *San Francisco,* 32 Fed. Rep.; *State* v. *Payssan,* 47 La. Ann. 1030; *Ex parte Casinello,* 62 Cal. 538; *Green* v. *Savannah,* 6 Ga. 1; *Cronin* v. *The People,* 82 N. Y. 318; *Taunton* v. *Taylor,* 116 Mass. 254; *Ashbrook* v. *Com.,* 1 Bush, 139; *Fertilizer Co.* v. *Hyde Park,* 97 U. S. 659.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The plaintiff in error does not, of course, deny that the reasonable regulation of the disposition of daily accumulating garbage and miscellaneous refuse matter in the District is a subject within the police power of Congress, the execution of which it may delegate to the municipal authorities in general terms. Nor does he deny that the regulations promulgated by the Commissioners, under the authority of Congress, are substantially within the powers attempted to be conferred.

The conviction, therefore, might probably be upheld upon the evidence submitted and agreed upon as constituting the entire defense, without passing upon the question whether, under certain particular conditions, the act and the regulations thereunder would operate as an unreasonable and oppressive restraint of the use and employment of private property. For whilst the evidence shows that the garbage transported by the defendant was contained in cans of the prescribed character, it fails to show that the wagon was constructed, marked, and numbered as the regulations require.

This requirement is that " each cart or other vehicle used for the purpose of removing garbage shall have the word ' garbage ' and the number of the wagon in large white letters on a black ground, plainly painted or attached to each side of the wagon bed, which shall be of metal, water-tight, and provided with tight-fitting covers, and be approved by the superintendent of street cleaning. * * * And it shall be unlawful for any person to use for the removal of garbage or dead animals any cart, wagon, vehicle or conveyance not so approved."

Moreover, it was conceded on the argument that the wagon used was an ordinary, open farm wagon, upon a contention that the regulation, in that respect also, was unreasonable and oppressive, in that the cost of such a wagon for occasional use would render the performance of the defendant's contract impracticable, and amount to a practical prohibition in the case of all farmers similarly situated, of the

business of buying city garbage for feeding hogs and fertiliz-
ing lands. The rule respecting the character of wagons is
general in its application and would stand even if the subse-
quent provisions limiting the removal of garbage exclusively
to the public contractor, should be declared invalid.

Now, if the removal of garbage were left free to house-
holders and their private contractors or vendees, the require-
ment that it shall be transported in wagons of a certain con-
struction, designation and number would not be an unreason-
able one. Wagons delivering milk and other articles that
are subject to inspection in the interest of the public health,
are often required to be marked so that they may be of ready
identification, and numbers are generally required to be borne
by all public vehicles for the transportation of persons or
parcels. It is quite reasonable that wagons engaged in haul-
ing garbage along the public streets shall be constructed so
as to prevent, as far as may be practicable, the escape of
any of its particles and effluvia. The conspicuous mark indi-
cating the uses of the wagon is doubtless intended to enable
the police and health inspectors the more easily to identify
it and keep it under that constant supervision which the pub-
lic safety and comfort demands.

2. We will not, however, confine the decision to this nar-
row ground. The argument has been almost entirely directed
to other and more serious objections to the operation of the
regulations, and these, which are of importance to both the
individual and public interests involved, will be considered
and passed upon. In a recent case we had occasion to con-
sider these same regulations, in so far as they then applied
to the removal of dead animals. The proof having shown
that a horse had just died, that the carcass was neither of-
fensive nor in a condition to endanger the public health,
that it had a market value in its then condition, and that the
owner had removed it within a reasonable time in a wagon
conforming to all the requirements, we held that the regula-
tion practically prohibited the owner from removing and
utilizing his property under such circumstances was in excess
of the police power and an unreasonable invasion of his

rights; in other words, that the animal had not ceased to be property by its death and was removed before it could lawfully be declared a nuisance. *Campbell* v. *District of Columbia,* 19 App. D. C. 131.

Many of the decisions relied on by the defendant in error in that case had relation to regulations concerning the disposition of garbage, and referring thereto it was said: " It may well be that from the nature of garbage a different rule would apply; but that phase of the question is not involved and we express no opinion upon it." It is now fairly presented, and after much consideration we are of the opinion that a different rule does apply.

The agreed statement of facts shows that the matter for the transportation of which the defendant was tried, was garbage from two hotels. Garbage as used in the act of Congress must be given its ordinary meaning which is: Offal — Refuse animal or vegetable matter from a kitchen — Worthless, offensive matter. See Webster's Dictionary. The regulation, proceeding no doubt upon the idea that specific information was expedient, defined garbage as " the refuse of animal and vegetable food stuffs." Both from the word itself, and the official definition, the ordinary mind would understand the regulation as applying to matter which is in fact noisome, and to that also which has been rejected as worthless and mingled with it. And the courts may well take notice that such matter, if not specifically regulated in respect of speedy and careful removal and disposition, would be a menace to the public health as well as a nuisance in other ways.

It must be presumed, also, that Congress, which is charged with the protection of the public health and comfort in the District of Columbia, was fully informed as regards the probable danger to health in a large and growing city from the careless deposit and disposition of garbage, before legislating upon the subject. *Moses* v. *United States,* 16 App. D. C. 428, 437, 438. Apparently, the apprehension of danger was so great that the act itself was made to contain certain stringent provisions, in respect of which the Commissioners

were given no discretion whatever. For example: It not only contemplates the speedy and safe reduction or consumption of the refuse matter, but also expressly provides that none of it shall be " dumped into the Potomac river or other waters, *or fed to animals, or exposed to the elements upon lands.*" Thus it appears to have been apprehended that the public health would be endangered also through feeding animals upon garbage, and using it as manure, and there is nothing in the record to establish the fact that such apprehension is unfounded or unreasonable. The mere fact that the defendant was willing to buy garbage and use it for those purposes is not sufficient to remove it from the category of nuisances, and settle its character as property. Whilst money value is evidence, and sometimes very strong evidence to that end, it is not of itself sufficient to make a case of unreasonableness or oppression against the law and the regulations under consideration. Some members of the community may be willing to expose their own health to danger through the use of noisome manures, and to eat the flesh of animals fed upon garbage, or to sell such flesh for food to others who may be unaware of its character, but their practices cannot make a rule of community observance. It is against the ignorance, the indifference, the selfishness, the avarice, the willful disregard of just and intelligent public opinion, that the police power must be constantly invoked on behalf of the common safety and advantage.

We have found no case directly deciding the question as presented in the case at bar, but several well-considered decisions, cited below, clearly establish the principle upon which we rest our conclusion. *Vandine, Petitioner,* 6 Pick. 187, 191; *City of Grand Rapids* v. *De Vries,* 123 Mich. 570; *State* v. *Payssan,* 47 La. Ann. 1029; *State* v. *Orr,* 68 Conn. 101, 112; *Walker* v. *Jameson,* 140 Ind. 591.

The police power is the emanation of that inborn principle of human nature which led men into society and created the body politic to which sovereignty pertains for the purpose of securing safety, order and the common weal. To effect these ends, the government is intrusted with the power to make

reasonable regulations restrictive of individual impulse. As population increases in rapid proportion, new physical conditions are developed which suggest, as reasonable, regulations and restraints of person and property before unknown. As civilization advances with increased and deeper knowledge, science makes new discoveries in respect of the dissemination of disease through infection, which necessitate radical changes in methods for the protection of human life.

For these reasons it is apparent that no hard and fast rule can be laid down for the government of all cases arising out of the frequent exercise of the police power. Each case must turn upon its own peculiar circumstances and conditions, and it is only when these clearly show that the regulations or restrictions imposed have no substantial relation to objects within the police power and therefore constitute a palpable invasion of private right, that the courts are justified in denying their obligation. In *Campbell* v. *District of Columbia, supra,* we were of the opinion that the regulation, as applied to the facts of that case, was of such character.

The distinction between the two cases is clear. The carcass was valuable, had undergone no decay whatever, and was promptly removed in a wagon of approved construction. The death of a horse is of comparatively infrequent occurrence and not capable of producing constant, widespread apprehensions of danger or discomfort.

Garbage, as we have seen, is necessarily composed largely of matter noisome even before its deposit in the receptacles provided for it, and other matter mingled with it must necessarily partake of its offensive character. Moreover, it is a thing of almost hourly accumulation in every occupied house of a large city, and is therefore a constant menace to the health and comfort of thousands of people. These conditions amply justify the application of a different rule as regards its collection, removal, and final disposition.

In reaching the conclusion that the regulation, under the facts of this case, is a valid exercise of the police power, we are not to be understood as holding that all matter which may be laid aside, merely, in the preparation of dishes for the

table, is necessarily garbage and therefore subject to the same regulation in all respects. We agree with the Supreme Court of Connecticut in the case before cited (*State* v. *Orr*), that there may be some things as, for example, meat trimmings, fruit and vegetable parings and the like, that are capable of unobjectionable uses. These, the owner could not be compelled to throw away, but might make any reasonable use of before they could become offensive. But when such matter is mingled with garbage it becomes likewise subject to public control, notwithstanding that, in some instances, the owners might be able to dispose of it for a price to persons willing to handle and make use of it, in its unreduced state, as either animal food or manure.

The judgment will be affirmed, with costs; and it is so ordered.                              *Affirmed.*